## HALL *v.* KIMBALL.

A decree of the court below, adjusting the rights of claimants to a fund of $18,000, *affirmed.*

No. 388. Submitted January 21, 1895. Decided March 5, 1895.

HEARING on an appeal from a decree on a bill of interpleader. *Affirmed.*

The FACTS are sufficiently stated in the opinion.

*Mr. James Coleman* and *Mr. W. P. Metcalf* for the appellant.

*Mr. J. J. Darlington* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This case, which presents an issue of fact only, began in a bill of interpleader filed June 23, 1891, by Oscar L. Dana against the parties, appellant and appellee herein, respectively. He alleged the possession of a note for the sum of $18,000, dated February 7, 1891, made by John and Emily Walter, payable three years after date to John M. Maury or order, with six per cent. semi-annual interest. It was endorsed by Maury, without recourse, to F. P. McLean. It was secured by a deed of trust on land in the District. The bill charged that the note had been purchased by money delivered to him as follows: $8,000 by Franklin P. McLean and $10,000 by Helen L. McL. Kimball, and that said Kimball claimed an interest of $10,000 therein and Martha Hall, as

administratrix of the estate of Franklin P. McLean, deceased, claimed the whole. The parties answered and, pending the litigation, the money due on the note, with accrued interest, was paid by the makers and deposited in the registry of the court. The decree, appealed from, ordered $10,000 of the principal fund, with its accumulated interest, to be paid to Mrs. Helen L. McL. Kimball, and the remainder, after deducting costs, to be paid to the appellant Martha Hall, administratrix.

Franklin P. McLean was never married, and died intestate at Huntington, Florida, March 5, 1891. Martha Hall was his sister and took out letters of administration upon his estate. The nearest surviving relations of deceased were his sister, Mrs. Hall, a stepmother and two half sisters. Mrs. Kimball was the first cousin of deceased's father, and was a widow, without children. In 1891 she was about sixty-five years of age. Franklin P. McLean came to Washington from California in 1877, aged about twenty-three years. He had, at first, some temporary employment as private secretary to one of the Senators from California. In October and November, 1877, he had temporary employment in the Agricultural Department of the Government at $2.00 per day. About the latter part of the year 1877, he called to see his cousin, Mrs. Kimball, who received him kindly. He soon came to live with her and for more than two years devoted himself to the study of medicine, in which he took his degree. He had previously graduated at the University of California and seems to have been a chemist of some learning and skill. During the time that he was engaged in his medical studies Mrs. Kimball gave him his board and also gave him money to pay tuition fees and to purchase necessary books. She treated him as a son and he seemed very fond of her, and often spoke to his friends of his obligation to and affection for her.

In March, 1880, he entered the Census Office at a salary of $900 per year. Very soon he changed into the Patent

Office, commencing as a copyist with a salary of $900 per year. Promotion followed, and in June, 1886, he became a principal examiner at a salary of $2,400 per year, which was increased to $2,500 in July, 1890, and continued to the time of his death. He was in poor health, and for some time prior to his death suffered greatly from abscesses in the head. He kept his room at Mrs. Kimball's until some time in 1887. She gave up her house and he occupied rooms at several places until in the summer or fall of 1888 he leased a house on Rhode Island avenue. Several persons had rooms in the house and boarded there. He sent for his niece, who came in the fall of 1888. She had a place in one of the departments of the Government, and roomed at the house. Mrs. Hall, whose husband was living, came too (it does not appear when), and for a time superintended the housekeeping. She afterwards went to her husband at some place in Pennsylvania and did not return until Dr. McLean's death. On October 1, 1890, Mrs. Kimball, at Dr. McLean's request, came to live in the house, but she paid board therefor. On account of the trouble with his head and general ill health, Dr. McLean obtained leave of absence for a trip to Florida and Cuba. He asked Mrs. Kimball to go with him, and they left on the evening of February 7, 1891. On the return from Cuba he was taken ill and died in Florida from congestion of the brain. Mrs. Kimball remained with him and brought his remains to Washington, whence they were removed to Greenwood Cemetery, at Brooklyn, N. Y., and buried in a lot belonging to her. A few days before his departure for Cuba, Dr. McLean requested Mrs. Kimball to inquire for an investment for the sum of $18,000 or $20,000. No one seems to know how he came into possession of this sum. She saw Hill & Johnston, a firm of brokers, who negotiated the loan with Walter and wife. On February 6, 1891, he took a $10,000 bank bill from a place of concealment and gave it to Mrs. Kimball to deposit in bank for herself. Some time in January he had told her of his

having this bill and its place of concealment and that he in-
tended it for her so she could have a bank account of her
own and something to depend upon when she should give
up her place in the Treasury, where she was employed as
librarian.   She deposited the money in the Lincoln National
Bank as her own and in her own name on February 6, and
received the customary pass book of depositors showing the
same.   When the loan of $18,000 was agreed upon, he told
Mrs. Kimball to draw $10,000 on account of it and he
would furnish $8,000.   On the afternoon of the 7th he had
her to send for her brother-in-law, Oscar F. Dana, to come
and take charge of the matter as it could not be concluded
before they left.   Mr. Dana was a lawyer, and employed as
such in the service of the Government.   He came to the
house and Dr. McLean told him to look carefully at the note
and trust deed, etc., and be sure that everything was regular.
He drew his check for $8,000, payable to the order of Hill
& Johnston, and suggested to Mrs. Kimball to draw hers for
$10,000 to the same payees, which she did.   Both were de-
livered to Dana to turn over at the proper time, and he was
directed by Dr. McLean to hold the note and securities for
them and as their investment.   Dana presented the checks
at the respective banks on the next day and had them certi-
fied, and when the transaction of the loan was complete
gave them to Hill & Johnston.   He received from them the
note of Walter and wife and held it for the parties as re-
quested.   The note was made payable to John M. Maury,
an employee of Hill & Johnston, and by him indorsed to F.
P. McLean.   This, it seems, was done by Hill & Johnston
at the suggestion of Mrs. Kimball when she arranged for
the investment.   They asked to whom the note should be
indorsed and she said to F. P. McLean.   Dana testifies that
he at first objected to taking the note, as thus indorsed, but
finally acceded.

The contention of the appellant is that the money was
not intended as a gift to Mrs. Kimball, but was to be held

by her in trust for Dr. McLean, and that the endorsement of the note to him alone, by order of Mrs. Kimball, was an execution of the trust. The reason for this action on the part of Dr. McLean was attempted to be furnished in the charge that he was under apprehension of a suit for damages by a woman who, for a time, had occupied a room in his house, and desired to conceal his money. It would subserve no useful purpose to review the evidence in support of this contention. It is sufficient to say that it falls far short of its object. The fact that the money was delivered to Mrs. Kimball, deposited in the bank in her name and drawn out on her check is undisputed. This made a *prima facie* case in her favor which it was necessary to overcome. The testimony of Dana is plain and positive that the direction to him by Dr. McLean was to hold the note for account of both parties advancing the money. This, supported as it is by other circumstances, is not overcome by the fact that the note was endorsed to the order of McLean alone. It is shown by the evidence that Mrs. Kimball had been very kind to Dr. McLean and had rendered him material assistance at a time of great need. There was no break in their affection for each other or in their mutual confidence. It is true that he had made some returns for her kindness. He had lent her some money to assist in building a cottage in one of the villages near Washington, and for other purposes; but he had often afterwards expressed the sense of a great obligation, still unfulfilled, and an intention to make a provision for her independence. Although he assisted his sister and niece and even brought them to live with him, he does not appear to have entertained any sense of obligation to them.

The testimony of disinterested witnesses indicates that he entertained greater affection for Mrs. Kimball than for any one else and gave her his complete confidence. The suggestion that he selected her to hold the $10,000 in her own name, but in trust for him, to prevent its being subjected to

a possible suit and judgment for damages, is evidence at least of very great confidence.

When, broken in health, he made a last attempt to find relief from his sufferings by traveling to a warmer climate, Mrs. Kimball was his chosen companion. In the light of all the facts and circumstances shown by the evidence it is quite natural that he should have made her an absolute gift of the $10,000 and arranged for its safe investment, and it is impossible for us to come to any other conclusion.

It follows, therefore, that *the decree should be affirmed, with costs to the appellee; and it is so ordered.*